**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TEQUILLA JORDAN, individually, and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. _____ |
| v. | |
| THE PENSION SPECIALISTS, LTD., | **CLASS REPRESENTATION** |
| Defendant. | **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Tequilla Jordan ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this action against The Pension Specialists, Ltd. ("TPS" or "Defendant"). Plaintiff brings this action by and through her attorneys, and allege, based upon personal knowledge as to her own actions, and based upon information and belief and reasonable investigation by her counsel as to all other matters, as follows.

## I.     **INTRODUCTION**

1.      The Pension Specialists, Ltd. is a retirement services administrator that currently administers the plans of 30,000 individuals and businesses across the United States.

2.      As part of its operations, TPS collects, maintains, and stores highly sensitive personal information belonging to its customers, including, but not limited to their full names, Social Security numbers, driver's license numbers, other government issued ID numbers, (collectively, "personally identifying information" or "PII"), as well as health insurance information and financial account/payment card information (collectively with PII, "Private Information").

3. Between February 18 and February 20, 2024, TPS experienced a data breach incident in which unauthorized cybercriminals accessed its information systems and databases and access and exfiltrated Private Information belonging to Plaintiff and Class members (the "Data Breach"). According to TPS, it "experienced a network disruption" on February 24, 2024. Subsequent investigation by TPS determined that the unauthorized actors were able to access and potentially exfiltrate Private Information concerning Plaintiff and Class members.

4. On February 14, 2025, TPS sent a notice to individuals whose information was accessed in the Data Breach.

5. Because TPS stored and handled Plaintiff's and Class members' highly-sensitive Private Information, it had a duty and obligation to safeguard this information and prevent unauthorized third parties from accessing this data.

6. Ultimately, TPS failed to fulfill this obligation, as unauthorized cybercriminals breached TPS's information systems and databases and stole vast quantities of Private Information belonging to TPS's customers, including Plaintiff and Class members. The Data Breach—and the successful exfiltration of Private Information—were the direct, proximate, and foreseeable results of multiple failings on the part of TPS.

7. The Data Breach occurred because TPS failed to implement reasonable security protections to safeguard its information systems and databases. Moreover, before the Data Breach occurred, TPS failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiff and Class members been made aware of this fact, they would have never provided such information to TPS.

8. TPS's subsequent handling of the Data Breach was also deficient.

9.      TPS unreasonably delayed for one year before it began informing victims of the Data Breach.

10.     Furthermore, TPS's meager attempt to ameliorate the effects of this data breach with one year of complimentary credit monitoring is woefully inadequate. Much of the Private Information that was stolen is immutable and one year of credit monitoring is nothing in the face of a life-long heightened risk of identity theft.

11.     As a result of TPS's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiff and Class members suffered injuries, but not limited to:

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges;

- Time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach;

- Charges and fees associated with fraudulent charges on their accounts; and

- The continued and increased risk of compromise to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

12.     Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief for the consequences of Defendant's failure to reasonably safeguard Plaintiff's and Class members' Private Information; its failure to reasonably provide timely notification to

Plaintiff and Class members that their Private Information had been compromised; and for Defendant's failure to inform Plaintiff and Class members concerning the status, safety, location, access, and protection of their Private Information.

## II.    PARTIES

**Plaintiff Tequilla Jordan**

13.    Plaintiff is a resident and citizen of Rockford Illinois. Plaintiff Jordan was a customer at TPS. Plaintiff Jordan received Defendant's Data Breach Notice.

**Defendant The Pension Specialists, Ltd.**

14.    The Pension Specialists, Ltd. Is an Illinois Corporation with a principal place of business located at 10501 N. 2nd Stress, Machesney Park, Illinois, 61115. Defendant conducts business throughout Illinois and the United States.

## III.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

16.    This Court has personal jurisdiction over Defendant because Defendant is headquartered in Illinois.

17.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District and because Defendant resides in this District.

## IV.   FACTUAL ALLEGATIONS

**A.   The Pension Specialists Ltd. – Background**

18.   TPS is a retirement services administrator. As part of its normal operations, TPS collects, maintains, and stores large volumes of Private Information belonging to its current and former customers.

19.   TPS failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing the Private Information of TPS's current and former customers—Plaintiff and Class members.

20.   Current and former customers of TPS, such as Plaintiff and Class members, made their Private Information available to TPS with the reasonable expectation that any entity with access to this information would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, these entities would provide them with prompt and accurate notice.

21.   This expectation was objectively reasonable and based on an obligation imposed on TPS by statute, regulations, industrial custom, and standards of general due care.

22.   Unfortunately for Plaintiff and Class members, TPS failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it failed to protect Plaintiff and Class members from having their Private Information accessed and stolen during the Data Breach.

**B.   The Data Breach**

23.   According to Defendant's public statements, cybercriminals breached TPS's information systems between February 18 and February 20, 2024. On February 24, 2024, TPS

experienced a "network disruption" and began an investigation, but it was not until December 16, 2024—301 days after the Data Breach—that TPS discovered the Data Breach.

24.     On February 14, 2025—approximately one year after the Data Breach began—TPS sent notice to individuals affected by this Data Breach.

25.     Omitted from the notice were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

26.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class members of the Data Breach's critical facts. Without these details, Plaintiff's and Class members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

27.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

28.     The attacker accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiff and Class members. Plaintiff's and Class members' Private Information was accessed and stolen in the Data Breach.

29.     Plaintiff further believes that her Private Information and that of Class members was or will be sold on the dark web, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

30.     TPS estimates that the Private Information belonging to at least 70,000 individuals was compromised in this incident.[1]

**C.     TPS's Many Failures Both Prior to and Following the Breach**

31.     Defendant collects and maintains vast quantities of Private Information belonging to Plaintiff and Class members as part of its normal operations. The Data Breach occurred as direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

32.     First, Defendant inexcusably failed to implement reasonable security protections to safeguard its information systems and databases.

33.     Second, Defendant failed to timely detect this data breach with Defendant's computer systems, becoming aware of the intrusion on December 16, 2024. This delayed detection provided these cybercriminals with 301 days to exploit stolen and sensitive Private Information belonging to Defendant's customers.

34.     Third, Defendant failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiff and Class members been aware that Defendant did not have adequate safeguards in place to protect such sensitive Private Information, they would have never provided such information to Defendant.

35.     In addition to the failures that led to the successful breach, Defendant's failings in handling the Data Breach and responding to the incident exacerbated the resulting harm to the Plaintiff and Class members.

---

[1] Massachusetts Attorney General, *Data Breach Notifications*, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9243b094-0b3c-404c-99cc-e0d10798e8f7.html (last accessed Feb. 24, 2025); Texas Office of the Attorney General, *Data Security Breach Reports*, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last access Feb. 24, 2025).

36.     Defendant's delay in informing victims of the Data Breach that their Private Information was compromised virtually ensured that the cybercriminals who stole this Private Information could monetize, misuse and/or disseminate that Private Information before the Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

37.     Additionally, Defendant's attempt to ameliorate the effects of this data breach with limited complimentary credit monitoring is woefully inadequate. Plaintiff's and Class members' Private Information was accessed and acquired by cybercriminals for the express purpose of misusing the data. As a consequence, they face the real, immediate, and likely danger of identity theft and misuse of their Private Information. And this can, and in some circumstances already has, caused irreparable harm to their personal, financial, reputational, and future well-being. This harm is even more acute because much of the stolen Private Information, such as healthcare data, is immutable.

38.     In short, Defendant's myriad failures, including the failure to timely detect an intrusion and failure to timely notify Plaintiff and Class members that their personal information had been stolen due to Defendant's security failures, allowed unauthorized individuals to access, misappropriate, and misuse Plaintiff's and Class members' Private Information for a year after the breach, and nine weeks after identifying the compromised Private Information before Defendant finally granted victims the opportunity to take proactive steps to defend themselves and mitigate the near- and long-term consequences of the Data Breach.

**D.** **Data Breaches Pose Significant Threats**

39.     Data breaches have become a constant threat that, without adequate safeguards, can expose personal data to malicious actors. It is well known that PII, and Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

40.     The Identity Theft Resource Center's ("ITRC") Annual End-of-Year Data Breach Report for 2023 listed 3,205 total compromises involving 353,027,892 victims.[2] This is nearly double the number of compromises in 2022, which had 1,802 total compromises involving 422,143,312 victims.[3] The 2022 figure was itself just 50 compromises short of the then record-breaking total of 1,852 set in 2021.[4] As it stands, the number of compromises in 2023 has managed to shatter 2021's record by a factor of 2.

41.     Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, confirms that the number of data breaches has been steadily increasing since it began a survey of data compromises in 2005 with 157 compromises reported that year, to a peak of 3,205 in 2023.[5] The number of impacted individuals has also risen precipitously from approximately 318 million in 2015 to 353 million in 2023.[6]

---

[2] IDENTITY THEFT RESOURCE CENTER, *2023 Data Breach Report*, (Jan. 2023), https://www.idtheftcenter.org/publication/2023-data-breach-report.
[3] IDENTITY THEFT RESOURCE CENTER, *2022 End of Year Data Breach Report* (Jan. 25, 2023), https://www.idtheftcenter.org/publication/2022-data-breach-report/?utm_source=press+release&utm_medium=web&utm_campaign=2022+Data+Breach+Report.
[4] *Id.*
[5] *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2023*, STATISTA (Nov/ 9, 2024), https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed.
[6] *Id.*



Figure 1 –*Number of Data Breaches and Affected Individuals from 2005 to 2023.* [7]

42.    This stolen PII is then routinely traded on dark web black markets as a simple commodity, with online banking login information costing an average of $100, full credit card details and associated details costing between $10 and $100, and comprehensive data packages enabling complete identity theft selling for $1,000.[8]

43.    In addition, the severity of the consequences of a compromised Social Security number belies the ubiquity of stolen numbers on the dark web. Criminals and other unsavory groups can fraudulently take out loans under the victims' name, open new lines of credit, and cause other serious financial difficulties for victims:

[a] dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your

---

[7] *Id.*
[8] Ryan Smith, *Revealed-how much is personal information worth on the dark web?*, INSURANCE NEWS (May 1, 2023), https://www.insurancebusinessmag.com/us/news/breaking-news/revealed--how-much-is-personal-information-worth-on-the-dark-web-444453.aspx.

good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[9]

This is exacerbated by the fact that the problems arising from a compromised Social Security number are exceedingly difficult to resolve. A victim is forbidden from proactively changing his or her number unless and until it is actually misused and harm has already occurred. And even this delayed remedial action is unlikely to undo the damage already done to the victims:

Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[10]

44. Further, as data breaches become ever more prevalent and as technology advances, computer programs can scan the internet to create a mosaic of information that could be used to link compromised information to an individual in ways in a phenomenon known as the "mosaic effect." By and through this process, names, dates of birth, and contact information such as telephone numbers and email addresses, hackers and identity thieves can access users' other accounts by, for example, bypassing security questions and 2FA security with the comprehensive collection of information at their disposal.

45. Thus, because of this effect, cybercriminals and other unauthorized parties could use Plaintiff's and Class Members' Private Information to access, inter alia, email accounts and

---

[9] UNITED STATES SOCIAL SECURITY ADMINISTRATION, *Identity Theft and Your Social Security Number*, (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.
[10] *Id.*

financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members, even when that specific category of information is not compromised in a given breach.

46.     A particularly troubling example of this effect is the development of "Fullz" packages. A "fullz" packages is a dossier of information that cybercriminals and other unauthorized parties can assemble by cross-referencing the Private Information compromised in a given data breach to publicly available data or data compromised in other data breaches. Automated programs can and are routinely used to create these dossiers and they typically represent an alarmingly accurate and complete profile of a given individual.

47.     Therefore, through the use of these "Fullz" packages, stolen Private Information from this Data Breach can be easily linked to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. Thus, even if certain information such as emails, phone numbers, or credit card or financial account were not compromised in this Data Breach, criminals can easily create a Fullz package to sell for profit.

48.     Upon information and belief, this has already transpired (and will continue to transpire) for Plaintiff and the Class. And any reasonable trier of fact will find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

49.     Upon information and belief, this has already transpired (and will continue to transpire) for Plaintiff and the Class. And, any reasonable trier of fact will find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

50.     In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate

protection of consumers' personal data, including recent cases against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized these enforcement actions to place companies like Defendant on notice of their obligation to safeguard customer and customer information.[11]

51.     Given the nature of Defendant's Data Breach, as well as the length of the time Defendant's networks were breached and the long delay in notification to victims thereof, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiff's and Class members' Private Information can easily obtain Plaintiff's and Class members' tax returns or open fraudulent credit card accounts in Class members' names.

52.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[12] The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

53.     To date, Defendant has offered its consumers only limited identity theft monitoring services. The services offered are inadequate to protect Plaintiff and Class members from the threats they will face for years to come, particularly in light of the Private Information at issue here.

---

[11] *See, e.g.*, *In the Matter of SKYMED INTERNATIONAL, INC.*, C-4732, 1923140 (Fed. Trade Comm'n, Jan. 26, 2021).
[12] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1; *see also Why Your Social Security Number Isn't as Valuable as Your Login Credentials*, IDENTITY THEFT RESOURCE CENTER (June 18, 2021), https://www.idtheftcenter.org/post/why-your-social-security-number-isnt-as-valuable-as-your-login-credentials/.

54. Despite the prevalence of public announcements of data breach and data security compromises, its own acknowledgment of the risks posed by data breaches, and its own acknowledgment of its duties to keep Private Information private and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class members from misappropriation. As a result, the injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for its current and former customers.

**E.      TPS Had a Duty and Obligation to Protect Private Information**

55. Defendant has an obligation to protect the Private Information belonging to Plaintiff and Class members. First, this obligation was mandated by government regulations and state laws, including FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of sensitive PII. Third, Defendant imposed such an obligation on itself with its promises regarding the safe handling of data. Plaintiff and Class members provided, and Defendant obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

**1.      FTC Act Requirements and Violations**

56. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

14

57.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[13] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[14] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[15] Defendant clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

58.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

59.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

---

[13] FEDERAL TRADE COMM'N, *Protecting Personal Information: A Guide for Business*, (Oct. 2016) available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed August 15, 2023).
[14] *Id.*
[15] *Id.*

unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

60.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

61.     Defendant was fully aware of its obligation to protect the Private Information of its current and former customers, including Plaintiff and Class members. Defendant is a sophisticated and technologically savvy business that relies extensively on technology systems and networks to maintain its practice, including storing its customers' PII financial information in order to operate its business.

62.     Defendant had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendant and Plaintiff and Class members. Defendant alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiff's and Class members' Private Information.

## 2.     Industry Standards and Noncompliance

63.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

64.     Some industry best practices that should be implemented by businesses dealing with sensitive Private Information, like Defendant, include but are not limited to: educating all

employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

65.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

66.     Defendant should have also followed the minimum standards of any one of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

67.     Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**3.      Defendant's Own Stated Policies and Promises**

68.     Defendant's own published privacy policy states that: "is committed to maintaining the confidentiality, and security of personal information entrusted to us by current and prospective customers. We are proud of our privacy practices and we want you to know we protect your information and we use it to service your account," and that "TPS has always considered the

protection of sensitive information to be a sound business practice and important for customer trust. We use information protection controls in keeping with industry standards and practices, and we regularly adapt these procedural controls to respond to changing requirements and advances in technology.[16]

69.     Defendant failed to live up to its own stated policies and promises with regards to data privacy and data security as cybercriminals were able to infiltrate its systems and steal the Private Information belonging to Plaintiff and Class members.

**F.      Plaintiff and the Class Suffered Harm Resulting from the Data Breach**

70.     Like any data hack, the Data Breach presents major problems for all affected.[17]

71.     The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[18]

72.     The ramifications of Defendant's failure to properly secure Plaintiff's and Class members' Private Information are severe. Identity theft occurs when someone uses another person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

73.     According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.

---

[16] The Pension Specialists, Ltd., "Privacy Policy," available at https://www.pensioninsider.com/privacy-policy (last accessed Feb. 24, 2025).
[17] Paige Schaffer, *Data Breaches' Impact on Consumers*, INSURANCE THOUGHT LEADERSHIP (July 29, 2021), https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.
[18] FED. TRADE COMM'N, *Warning Signs of Identity Theft*, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last accessed Feb. 11, 2025).

74. Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

75. Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. According to a recent study published in the scholarly journal *Preventive Medicine Reports*, public and corporate data breaches correlate to an increased risk of identity theft for victimized consumers.[19] The same study also found that identity theft is a deeply traumatic event for the victims, with more than a quarter of victims still experiencing sleep problems, anxiety, and irritation even six months after the crime.[20]

76. There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' Private Information will do so at a later date or re-sell it.

77. Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[21]

78. In response to the Data Breach, Defendant offered to provide certain individuals whose Private Information was exposed in the Data Breach with 1 year of credit monitoring.

---

[19] David Burnes, Marguerite DeLiema, and Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, PREVENTIVE MEDICINE REPORTS, Vol. 17 (Jan. 23, 2020), https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.
[20] *Id.*
[21] *Cost of a Data Breach Report 2023*, IBM Security (2023), https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymB hAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_B wE&gclsrc=aw.ds.

However, this is inadequate to protect victims of the Data Breach from the lifelong risk of harm imposed on them by Defendant's failures.

79.     Moreover, the credit monitoring offered by Defendant is fundamentally inadequate to protect them from the injuries resulting from the unauthorized access and exfiltration of their sensitive Private Information.

80.     Here, due to the Data Breach, Plaintiff and Class members have been exposed to injuries that include, but are not limited to:

    a.     Theft of Private Information;

    b.     Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

    c.     Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

    d.     Costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendant's delay in disseminating notice in accordance with state law;

    e.     The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

    f.     The loss of Plaintiff's and Class members' privacy.

81.     Plaintiff and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private

20

Information being accessed by cybercriminals, risks that will not abate within the limited time of credit monitoring offered by Defendant.

82.     As a direct and proximate result of Defendant's acts and omissions in failing to protect and secure Private Information, Plaintiff and Class members have been placed at a substantial risk of harm in the form of identity theft, and they have incurred and will incur actual damages in an attempt to prevent identity theft.

83.     Plaintiff retain an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Private Information was accessed in the Data Breach.

## G.     EXPERIENCES SPECIFIC TO PLAINTIFF

### *Tequilla Jordan*

84.     Plaintiff Tequilla Jordan is a former customer of TPS services, which administered the retirement plan of her former employer.

85.     Plaintiff Jordan received TPS's data breach notice. The notice informed Plaintiff Jordan that her Private Information was improperly accessed, including but not limited to Plaintiff Jordan's name and Social Security number.

86.     After the Data Breach, Plaintiff Jordan experienced multiple new financial accounts being opened in her name, and an increase in spam messages and emails.

87.     As a result of the Data Breach, Plaintiff Jordan has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Jordan has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

88.     As a result of the Data Breach, Plaintiff Jordan has suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her Private Information for purposes of identity theft and fraud. Plaintiff Jordan is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

89.     Plaintiff Jordan suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

90.     As a result of the Data Breach, Jordan anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.      CLASS REPRESENTATION ALLEGATIONS

91.     Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose Private Information was accessed
> in the Data Breach.

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

92.     In the alternative, Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a subclass of:

> All persons who are residents of the State of Illinois whose Private Information was accessed in the Data Breach (the "Illinois Subclass").

Excluded from the Subclass are Defendant, its executives and officers, and the Judge(s) assigned to this case.

93.     <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process. On information and belief, the number of affected individuals estimated to be 70,000.[22] The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

94.     <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.     When Defendant learned of the Data Breach;

b.     Whether hackers obtained Class members' Private Information via the Data Breach;

c.     Whether Defendant's response to the Data Breach was adequate;

d.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

e.     Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

---

[22] Massachusetts Attorney General, *supra* at 1.

f.  Whether Defendant owed a duty to safeguard Private Information;

g.  Whether Defendant breached its duty to safeguard Private Information;

h.  Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

i.  Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

j.  Whether Defendant's conduct violated the FTCA, and/or the Consumer Protection Act invoked herein;

k.  Whether Defendant's conduct was negligent;

l.  Whether Defendant's conduct was *per se* negligent;

m.  Whether Defendant was unjustly enriched;

n.  What damages Plaintiff and Class members suffered as a result of Defendant's misconduct;

o.  Whether Plaintiff and Class members are entitled to actual and/or statutory damages; and

p.  Whether Plaintiff and Class members are entitled to additional credit or identity monitoring and monetary relief.

95.  Typicality: Plaintiff's claims are typical of the claims of the Class as Plaintiff and all members of the Class had their Private Information compromised in the Data Breach. Plaintiff's claims and damages are also typical of the Class because they resulted from Defendant's uniform wrongful conduct. Likewise, the relief to which Plaintiff is entitled to is typical of the Class because Defendant has acted, and refused to act, on grounds generally applicable to the Class.

96.  Adequacy: Plaintiff is an adequate class representative because her interests do not materially or irreconcilably conflict with the interests of the Class she seeks to represent, she has retained counsel competent and highly experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately

protect the interests of the Class. Neither Plaintiff nor her counsel have any interests that are antagonistic to the interests of other members of the Class.

97. <u>Superiority</u>: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class, a class action is superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

98. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## VI.  **CAUSES OF ACTION**

### **COUNT I**
### **NEGLIGENCE**
**(By Plaintiff on behalf of the Class)**

99. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

100.     Defendant owes a duty of care to protect the Private Information belonging to Plaintiff and Class members. Defendant also owes several specific duties including, but not limited to, the duty:

a.      to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b.      to protect customers' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c.      to have procedures in place to detect the loss or unauthorized dissemination of Private Information in its possession;

d.      to employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class members pursuant to the FTCA;

e.      to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.      to promptly notify Plaintiff and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

101.     Defendant owes this duty because it had a special relationship with Plaintiffs and Class members. Plaintiff and Class members entrusted their Private Information to Defendant on the understanding that adequate security precautions would be taken to protect this information. Furthermore, only Defendant had the ability to protect its systems and the Private Information stored on them from attack.

102.     Defendant also owes this duty because industry standards mandate that Defendant protect its customers' confidential Private Information.

103.     Defendant also owes a duty to timely disclose any unauthorized access and/or theft of the Private Information belonging to Plaintiff and Class members. This duty exists to provide Plaintiff and Class members with the opportunity to undertake appropriate measures to mitigate

damages, protect against adverse consequences, and thwart future misuse of their Private Information.

104.     Defendant breached its duties owed to Plaintiff and Class members by failing to take reasonable appropriate measures to secure, protect, and/or otherwise safeguard their Private Information.

105.     Defendant also breached the duties it owed to Plaintiff and Class members by failing to timely and accurately disclose to them that their Private Information had been improperly acquired and/or accessed.

106.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class members were damaged. These damages include, and are not limited to:

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; and

- Permanent increased risk of identity theft.

107.     Plaintiff and Class members were foreseeable victims of any inadequate security practices on the part of Defendant and the damages they suffered were the foreseeable result of the aforementioned inadequate security practices.

108.     In failing to provide prompt and adequate individual notice of the Data Breach, Defendant also acted with reckless disregard for the rights of Plaintiff and Class members.

109.     Plaintiff are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring

procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(By Plaintiff on behalf of the Class)**

110.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

111.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, imposes a duty on Defendant to provide fair and adequate data security to secure, protect, and/or otherwise safeguard the Private Information of Plaintiff and Class members.

112.    Defendant violated the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to secure, protect, and/or otherwise safeguard Plaintiff's and Class members' Private Information.

113.    Defendant's failure to comply with the FTCA constitutes negligence *per se*.

114.    Plaintiff and Class members are within the class of persons that the FTCA are intended to protect.

115.    It was reasonably foreseeable that the failure to protect and secure Plaintiff's and Class members' Private Information in compliance with applicable laws and industry standards would result in that Information being accessed and stolen by unauthorized actors.

116.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class members have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to theft of their personal information, damages from the lost time and effort to mitigate the impact of the Data Breach, and permanently increased risk of identity theft.

117.     Plaintiff and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (By Plaintiff on behalf of the Class)

118.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

119.     Plaintiff and Class members provided Defendant with their Private Information.

120.     By providing their Private Information, and upon Defendant's acceptance of this information, Plaintiff and the Class, on one hand, and Defendant, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contract entered into between the parties.

121.     The implied contracts between Defendant and Plaintiff and Class members obligated Defendant to take reasonable steps to secure, protect, safeguard, and keep confidential Plaintiff's and Class members' Private Information. The terms of these implied contracts are described in federal laws, state laws, and industry standards, as alleged above. Defendant expressly adopted and assented to these terms in its public statements, representations and promises as described above.

122.     The implied contracts for data security also obligated Defendant to provide Plaintiff and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their Private Information.

123.     Defendant breached these implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the Private

Information belonging to Plaintiff and Class members; allowing unauthorized persons to access Plaintiff's and Class members' Private Information; and failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiff and Class members, as alleged above.

124.     As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class members have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of Private Information, and are entitled to damages in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiff on behalf of the Class)**

125.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

126.     This count is brought in the alternative to Count III.

127.     Plaintiff and the Class have a legal and equitable interest in their Private Information that was collected and maintained by Defendant.

128.     Plaintiff and the Class conferred their Private Information to Defendant as part of receiving financial services. Plaintiff and the Class also conferred payment to Defendant in exchange for financial services.

129.     Plaintiff and Class members conferred their Private Information alongside payment with the understanding that the payment was, in part, to be used to implement data security sufficient to adequately protect their Private Information. And this payment represented a benefit that was to be used for a specific purpose.

130.     Defendant, as a health care service provider, received payment from its customers to handle and manage this Private Information. Plaintiff and Class members' conferral of their Private Information was a direct benefit since Defendant was able to use this information for

30

business purposes and financial gain. There was an understanding that a portion of the monies Defendant received from the use of this Private Information, was intended to be used to implement data security sufficient to adequately protect this Private Information.

131. Defendant understood that it was so benefitted.

132. However, instead of providing a reasonable level of security, training, protocols, and other measures that would have prevented the Data Breach, as described in detail above, Defendant, upon information and belief, knowingly and opportunistically elected to increase its own profits at the expense of Plaintiff and Class members by not expending the money required to do so.

133. And in failing to expend the monies conferred with the express understanding that it would be used on data security, Defendant knowingly and deliberately enriched itself at the expense of Plaintiff and Class members.

134. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and Class members in an unfair and unconscionable manner.

135. Defendant is therefore liable to Plaintiff and the Class for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically the value to Defendant of the Private Information that was accessed and exfiltrated in the Data Breach and the profits Defendant received from the use and sale of that information. Plaintiff and Class members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(By Plaintiff on behalf of the Class)**

136.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

137.     Plaintiff brings this claim on behalf of themselves and the Class.

138.     Plaintiff and Class members provided their Private Information to Defendant in confidence with the reasonable belief that Defendant would protect their information. Plaintiff and Class members would not have provided their information to Defendant had they known it would fail to adequately protect their information.

139.     In collecting and maintaining this Private Information, Defendant created a fiduciary relationship between it and Plaintiff and Class members. As such, Defendant owed a duty to *primarily* act for the benefit of its current and former customers upon matters within the scope of their relationship. This included a duty to protect Plaintiff's and Class Members' Private Information.

140.     Defendant breached these fiduciary duties by failing to implement adequate safeguards and causing Plaintiff's and Class members' Private Information to be disclosed to unauthorized third parties.

141.     As a direct and proximate result of Defendant's breaches of its fiduciary duties and the resulting disclosure of Plaintiff and Class member's Private Information, Plaintiff and Class members have suffered damages, including, but not limited to exposure to heightened future risk of identity theft, loss of privacy, confidentiality, emotional distress and humiliation.

**COUNT VI**
**INVASION OF PRIVACY**
**(By Plaintiff on behalf of the Class)**

142.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

143.    Plaintiff and Class members had a reasonable expectation of privacy in the Private Information that Defendant possessed and/or continues to possess.

144.    By failing to keep Plaintiff's and Class members' Private Information safe, and by misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use, Defendant invaded Plaintiff's and Class members' privacy by:

      a.    Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

      b.    Publicizing private facts about Plaintiff and Class members, which is highly offensive to a reasonable person.

145.    Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's position would consider Defendant's actions highly offensive.

146.    Defendant invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

147.    As a proximate result of such misuse and disclosures, Plaintiff's and Class members' reasonable expectation of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct amounted to a serious invasion of Plaintiff's and Class members' protected privacy interests.

148.    In failing to protect Plaintiff's and Class members' Private Information, and in misusing and/or disclosing their Private Information, Defendant has acted with malice and oppression and in conscious disregard of Plaintiff's and Class members' rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its millions of customers. Plaintiff, therefore, seek an award of damages, including punitive damages, on behalf of themselves and the Class.

33

**COUNT VII**
**VIOLATION OF THE ILLINOIS PERSONAL INFORMATION PROTECTION ACT**
**(By Plaintiff on behalf of the Illinois Subclass)**

149. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

150. This count is brought on behalf of all members of the Illinois Subclass.

151. The Illinois Personal Information Protection Act ("PIPA"), 815 ILCS 530/1, *et seq.*, obligates "data collectors" that own, license, maintain or store records that contain personal information of Illinois residents to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure." 815 ILCS 530/45.

152. Additionally, the PIPA creates a duty for data collectors to notify Illinois residents of any data breach "immediately following discovery" of the data breach. 815 ILCS 530/10(b).

153. Defendant is a "data collector" as defined by PIPA.

154. Defendant failed to implement and maintain reasonable security measures to safeguard, protect and keep confidential Plaintiff's and Illinois Subclass members' PII from unauthorized access or disclosure, as alleged herein.

155. Defendant, knowing and/or reasonably believing that Plaintiff's and Illinois Subclass members' PII was acquired or accessed by unauthorized persons during the Data Breach, failed to provide prompt, immediate, and reasonable notice of the Data Breach to Plaintiff and the Illinois Subclass as required by PIPA.

156. Defendant's failure to implement and maintain reasonable security measures to protect Plaintiff's and Illinois Subclass members' PII, and/or Defendant's failure to provide timely and accurate notice of the Data Breach violated the PIPA.

157. As a result of Defendant's failure to reasonably safeguard the PII belonging to Plaintiff and the Illinois Subclass, and Defendant's failure to provide reasonable and timely notice of the Data Breach to Plaintiff and the Illinois Subclass, Plaintiff and the Illinois Subclass have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

**COUNT VIII**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**PRACTICES ACT**
**(By Plaintiff on behalf of the Illinois Subclass)**

158. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

159. This count is brought on behalf of all Illinois Subclass members.

160. A violation of the PIPA constitutes an unlawful practices in violation of ICFA. 815 ILCS 530/20.

161. As described above, Defendant failed to implement and maintain reasonable security measures to safeguard, protect and keep confidential Plaintiff's and Illinois Subclass members' PII from unauthorized access or disclosure, as alleged herein.

162. Defendant, knowing and/or reasonably believing that Plaintiff's and Illinois Subclass members' PII was acquired or accessed by unauthorized persons during the Data Breach, failed to provide prompt, immediate, and reasonable notice of the Data Breach to Plaintiff and the Illinois Subclass as required by PIPA.

163. Defendant's failure to implement and maintain reasonable security measures to protect Plaintiff's and Illinois Subclass members' PII, and/or Defendant's failure to provide timely and accurate notice of the Data Breach violated the PIPA.

164.     By violating PIPA, Defendant's conduct constitutes an unlawful practice in violation of the ICFA.

165.     Plaintiff and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Defendant from disclosing their PII without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.      That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representatives; and appoint Plaintiff's Counsel as Class Counsel;

B.      That Plaintiff be granted the declaratory relief sought herein;

C.      That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.      That the Court award Plaintiff and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

E.      That the Court award Plaintiff and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

F.      That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G.      That the Court award pre- and post-judgment interest at the maximum legal rate;

H.      That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

I.      That the Court grant all other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Date: February 25, 2025                    Respectfully Submitted,

/s/ *Nickolas Hagman*
Nickolas J. Hagman
Daniel O. Herrera
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com

*Attorneys for Plaintiff and the Proposed Class*